# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Allen Christopher Epps, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:14-cv-48 |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Erik Laudenschlager, Steven Nagel, | ) | |
| Mark Kline, Caroline Folven, | ) | |
| Minot Police Department, Minot, City of, | ) | |
| Tony Mueller, and Sports on Tap, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Allen Christopher Epps (Epps) filed a pro se complaint pursuant to 42 U.S.C. § 1983 and North Dakota law. (Doc. #1). Defendants move for summary judgment, asserting that there is no evidence of any policy, custom, or practice that deprived Epps of his constitutional rights, that the individual defendant police officers are entitled to qualified immunity, and that Epps has not established the necessary elements to proceed with his claims against the non-governmental defendants. (Doc. #53; Doc. #58). The motions have been fully briefed by the parties.

## Summary

This court recommends that the district judge (1) determine that the record contains insufficient evidence of any policy, custom, or practice that caused Epps' alleged constitutional deprivations, (2) conclude that the individual defendant police officers are entitled to qualified immunity because Epps has not shown that his constitutional rights were violated, (3) conclude that there is no genuine issue of material fact as to any of the claims against the private actors, and (4) grant defendants' motions for summary judgment.

**Facts**

This case stems from an incident that occurred on January 6, 2013. On that date, Epps—then an Air Force captain—arrived at Sports on Tap in Minot, North Dakota, with two friends—both of whom were also members of the Air Force. (Doc. #78, pp. 4, 6-8). While at Sports on Tap, Epps became involved in a physical altercation with Kyle Dalby (Dalby). Id. at 10. Epps asked Tony Mueller (Mueller), the owner of Sports on Tap who was tending bar at the time, to call the police. Id. Mueller agreed to call the police. Id. Epps exited the bar and waited outside for police to arrive. Id. He then reentered the bar, asked again that the police be called, exited the bar, and continued to wait outside. Id.

After approximately ten to fifteen minutes, both of Epps' friends exited the bar, and Dalby likewise emerged from the bar. Id. at 11; (see also Doc. #1, p. 5). The physical altercation with Dalby continued outside of Sports on Tap. (Doc. #78, p. 11). Epps "took [a gun] out of [his friend's] vehicle and gave it to [his other friend]." Id. at 16. Police officers then arrived on the scene. Id. at 15-16. Epps, and others at the scene, were handcuffed.

After Epps was handcuffed, he notified the officers that a weapon was present, and he informed them of his concealed weapon license. Id. at 54. Officer Mark Kline (Kline) was "the original detaining officer," and Officer Erik Laudenschlager (Laudenschlager) "arrived on scene after Plaintiff and associates were cuffed and detained." (Doc. #1, p. 6); (see also Doc. #78, p. 55). Epps claims that Laudenschlager was met by Mueller, who pointed to "the parking lot and stated that there were three (3) black males that had a gun." (Doc. #1, p. 5). Laudenschlager stated he heard Epps issue

a threat regarding the gun, but Kline stated that Epps did not issue any threat. (Doc. #78, p. 56). Epps was informed he was being arrested for "terrorizing." Id. Epps asked officers to read him his Miranda rights, but Laudenschlager stated "I don't have to read you your rights until we start questioning you." Id. Laudenschlager and Officer Caroline Folven (Folven) asked Epps some questions—such as "what do you do on the base?"—but Epps remained silent. Id. at 57. He was transported to jail, was processed by jail personnel, was asked further questions, and was Mirandized. Id.; (see also Doc. #1, p. 6). Epps also requested a breathalyzer test, which was not performed. (Doc. #78, p. 95). He spent at least thirty-six hours, but less than forty-eight hours, in jail following his arrest. Id. at 75.

Laudenschlager completed an affidavit of probable cause, in which he stated that he heard Epps issue a threat regarding a gun, that Epps claimed ownership of the gun, but that Epps was not in possession of the gun at the time of the fight. (Doc. #65-10). Officer Steven Nagel (Nagel) also completed an affidavit, in which he stated that Epps, "in the presence of officers," issued a threat regarding a gun. (Doc. #65-4). A criminal charge of terrorizing was filed in state court on the basis of that statement. That charge was later dismissed when disciplinary proceedings were transferred to the Air Force. Id. at 16, 70, 80. As a result of the military proceedings, Epps was ultimately discharged from the Air Force. (Doc. #78, p. 51).

Epps subsequently filed the instant action, asserting the following claims against Laudenschlager, Nagel, Kline, Folven, Minot Police Department, and City of Minot (collectively, "Minot defendants"): (1) false arrest; (2) malicious prosecution; (3) negligence; (4) intentional infliction of emotional distress; and (5) false imprisonment.

Id. (Doc. #1, pp. 8-11). As to Mueller and Sports on Tap (collectively, "Mueller defendants"), Epps asserts four claims for negligence and one claim for negligent infliction of emotional distress. Id. at 11-14. All of his claims are based on Epps' position that he did not threaten use of a gun and was falsely accused of having done so, based on a false statement by a police officer.

## Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). When the moving party demonstrates that no material facts are in dispute, the nonmoving party then bears the burden of setting forth facts showing a genuine issue for trial. Id. While the court must view all facts and inferences in the light most favorable to the nonmoving party, id., "[f]actual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate if no reasonable jury could return a verdict for the nonmoving party. Id.

## Discussion

This court will separately consider the claims against the government actors and the claims against the private actors.

### 1.     Claims Against Governmental Defendants

Epps asserts the following causes of action against the Minot defendants: § 1983 claims for false arrest, malicious prosecution, and negligence; and state law claims for

intentional infliction of emotional distress and false imprisonment.

A.     Section 1983 Claims

Epps names the Minot Police Department as a defendant, but police departments are not entities amenable to suit under § 1983. See Ketchum v. City of W. Memphis, 974 F.2d 81, 82 (8th Cir. 1992) (departments and subdivisions of local governments are "not juridical entities suable as such"). The § 1983 claims against the Minot Police Department should therefore be dismissed with prejudice.

Each of the individual defendants is sued in his or her official capacity. (Doc. #1, p. 3). Section 1983 suits against government employees in their official capacities are actually suits against the entities of which the employees are agents. Monell v. Dep't of Soc. Serv., 436 U.S. 658, 690 n.55 (1978). Therefore, the § 1983 official capacity claims against the individual defendants must be construed as claims against the City of Minot. "When a plaintiff is seeking to impose section 1983 liability on a local government body, the plaintiff must show that there is an official policy or a widespread custom or practice of unconstitutional conduct that caused the deprivation of a constitutional right." Marksmeier v. Davie, 622 F.3d 896, 902 (8th Cir. 2010). "A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995).

Thus, to proceed with his § 1983 claims[1] against the City of Minot, Epps cannot

_____

[1] Epps asserts "[t]hat the Minot Police Department failed to properly train and adequately supervise its law enforcement officers and investigators." (Doc. #1, p. 8). He further asserts that "[t]he Officers[,] based on their brief investigation and lack of training, failed to ascertain the facts and true perpetrator in this case." Because Epps is proceeding pro se, the court liberally construes the allegations as asserting a failure to train claim. See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (stating pro se pleadings

5

rely on a respondeat superior theory—which he asserts throughout his complaint. Instead, he must show that an official policy, custom, or practice of unconstitutional conduct caused his alleged deprivations. The Minot defendants argue that Epps has presented no evidence of any such policy, custom, or practice.

In his deposition testimony, Epps acknowledged that he received and reviewed a copy of the City's police officer training manual. (Doc. #78, p. 98). When asked if he could identify anything lacking from the manual, Epps responded, "No, not in the manual." Id. at 99. Though Epps stated in his deposition that the "policies of the Minot Police Department" were faulty, he has offered no evidence—only his conclusory statements—to support that assertion. Because the Minot defendants have demonstrated that no material facts as to this issue are in dispute, Epps bears the burden of setting forth facts showing a genuine issue for trial. See Donovan, 289 F.3d at 529. After carefully reviewing the record, the court concludes that Epps has failed to set forth facts showing a genuine issue for trial as to any unconstitutional city policy, custom, or practice. Therefore, the Minot defendants' summary judgment motion with respect to the official capacity claims against the individual defendants and the claims against the City of Minot should be granted, and those claims should be dismissed with prejudice.

Epps also sued each of the individual defendant police officers in his or her

---

must be held to less stringent standards than pleadings drafted by attorneys). "Only where a municipality's failure to train its employees in a relevant respect evidences 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389 (1981).

personal capacity. (Doc. #1, p. 3). The Minot defendants argue that the individual police officers are entitled to qualified immunity. (Doc. #69, p. 9). Qualified immunity shields a government official from liability unless (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the conduct at issue. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Courts have discretion in deciding which prong of the qualified immunity analysis to address first. Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). In deciding the instant motions, the court should first consider whether Epps has shown that his constitutional rights were violated.

### (1). False Arrest

Epps first claims that he was falsely arrested, in violation of the Fourth Amendment. (Doc. #1, p. 8). He alleges that the "probable cause relied upon by law enforcement to arrest Plaintiff Epps was the product of fabrication and manipulation in an effort to fit a suspect in custody," and he maintains that "evidence tending to suggest Mr. Dalby was the true suspect was disregarded or suppressed." Id. at 8-9. The individual defendants argue the officers "had probable cause or at least 'arguable' probable cause to support Epps' arrest . . . , and their actions are therefore protected by qualified immunity." (Doc. #69, p. 13). The individual defendants add that "Epps is unable to present any evidence to support the essential elements of a false arrest claim." Id. Epps counters that defendants' assertion of qualified immunity is "unconscionable" and maintains that they did not have probable cause for his arrest. (Doc. #65, pp. 19-20).

The standard for establishing a false arrest claim is well-established:

> In connection to a Fourth Amendment false arrest claim, the relevant inquiry is whether the officers had probable cause to arrest . . . . Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense at the time of the arrest. [T]he probability, and not a prima facie showing, of criminal activity is the standard of probable cause. Therefore, law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so—provided that the mistake is objectively reasonable. Stated otherwise, the issue for immunity purposes is not probable cause in fact but arguable probable cause.

Smithson v. Aldrich, 235 F.3d 1058, 1062 (8th Cir. 2000) (citations and internal quotation marks omitted). "Probable cause is to be determined upon the objective facts available to the officers at the time of the arrest." Id. at 1064. Further, officers are not required to "conduct a mini trial" before making an arrest. Id. (citing Morrison v. United States, 491 F.2d 344, 346 (8th Cir. 1974)).

Epps was arrested for "terrorizing." (Doc. #1, p. 6). Under North Dakota Century Code section 12.1-17-04, terrorizing is defined as intending "to place another human being in fear for that human being's or another's safety," causing "serious disruption or public inconvenience," or having "reckless disregard of the risk of causing such terror, disruption, or inconvenience," and threatening "to commit any crime of violence or act dangerous to human life." This court therefore considers whether the totality of the facts justified the officers' belief—at the time of the arrest—that Epps had committed the offense of terrorizing.

The record evidence shows that officers responded to the incident after a 911 call, in which the caller stated that there was a fight in the parking lot of Sports on Tap and that a black male had a gun. (Doc. #70-1). As noted above, Epps acknowledges both that he was involved in an altercation in Sports on Tap and that he retrieved his gun from a

vehicle when the altercation continued outside. Although Epps claims an officer reported hearing Epps issue a threat in the officer's presence, which Epps denies, Epps does not dispute that an officer heard someone issue a threat in the officer's presence. Epps also alleges that the officers who responded to the incident committed various errors, such as not reviewing surveillance footage of the incident, failing to identify Dalby as the aggressor of the incident, and "fabricat[ing] or grossly misrepresent[ing]" statements regarding the incident.[2] (Doc. #1, p. 7). However, the officers were not required to "conduct a mini trial" before making an arrest. The court concludes that the totality of the facts demonstrate at least arguable probable cause for Epps' arrest. Accordingly, as to any false arrest claims, the Minot defendants are entitled to qualified immunity. Therefore, the Minot defendants' motion for summary should be granted,

---

[2] Epps also alleges violations of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Epps asked, at least twice after his arrest, for officers to read him his rights, but they did not do so until after he was processed at the jail; Epps claims officers asked him questions before he was Mirandized. (Doc. #78, p. 56; Doc. #1, p. 6). The Minot defendants acknowledge that Epps was not Mirandized until he was processed at the jail, but they contend they were not required to do so at the scene of the incident while they looked for the gun that had been reported. (Doc. #81, p. 10). The Minot defendants add that the remedy for a Miranda violation is exclusion of a statement from evidence, rather than a civil rights claim, and that "it is unclear what statement Epps wishes to have suppressed due to an alleged Miranda violation." Id. Epps states he "is not claiming that he made any inculpatory statements or that the statement that Officers alleged they heard Plaintiff utter would be inadmissible." (Doc. #65, p. 22) (emphasis added). Instead, Epps argues that the officers' failure to Mirandize him until after he was processed at the jail "was a direct violation of his civil rights."

The remedy for a Miranda violation is indeed the exclusion of any compelled self-incrimination and not a § 1983 action—a litigant cannot maintain a § 1983 action based on a Miranda violation. Hannon v. Sanner, 441 F.3d 635, 636 (8th Cir. 2006). Moreover, Epps admits that he is not claiming that he made any self-incriminating statements. Epps therefore cannot maintain a § 1983 claim for a Miranda violation, and that claim should be dismissed with prejudice.

and any false arrest claims should be dismissed with prejudice.

### (2). Malicious Prosecution

Epps next claims that he was maliciously prosecuted, in violation of his Fourth Amendment rights. (Doc. #1, p. 9). Epps reiterates his allegations relating to the false arrest claim, adding that "[O]fficer [Laudenschlager] willfully and maliciously falsified his report and sworn affidavit with fabricated information . . . [and] allowed the prosecution of Plaintiff Epps to commence based upon evidence he knew, or should have known, to be false or wholly misrepre[s]ented." Id. The individual defendants contend that the Eighth Circuit does not recognize a § 1983 claim for malicious prosecution. (Doc. #69, p. 20).

It is unclear whether malicious prosecution is recognized as a constitutional violation that could give rise to a § 1983 action. If the claim is actionable under § 1983, it appears it would arise under the Fourth Amendment. Harrington v. City of Council Bluffs, 678 F.3d 676, 679-81 (8th Cir. 2012). But, "[s]ufficient probable cause would defeat . . . § 1983 claims based on malicious prosecution." Id. at 679. As noted above, this court concludes that sufficient probable cause supported Epps' arrest for terrorizing. Following the arrest, Laudenschlager and Nagel completed affidavits setting forth their recollections of the incident; both stated that, in the presence of officers, Epps had issued a threat regarding a gun. The criminal terrorizing charge was filed on the basis of the officers' affidavits. Although Epps denies that he issued a threat regarding the gun, the record contains no evidence that the officers willfully falsified their affidavits. Hence, because the criminal proceeding was instituted on the basis of the officers' affidavits, there was sufficient probable cause, and Epps' § 1983 claim of

malicious prosecution cannot survive under the <u>Harrington</u> standard.

To the extent Epps raises a malicious prosecution claim under state law, the court considers the essential elements for proving such a claim. North Dakota requires the following elements to maintain a malicious prosecution action: "1. A criminal proceeding instituted or continued by the defendant against the plaintiff. 2. Termination of the proceeding in favor of the accused. 3. Absence of probable cause for the proceeding. 4. 'Malice,' or a primary purpose other than that of bringing an offender to justice." <u>Richmond v. Haney</u>, 480 N.W.2d 751, 755 (N.D. 1992).

As to the first element, the court notes that Epps was criminally prosecuted by the Ward County State's Attorney's office, which is not a party to this lawsuit. During his deposition, Epps conceded that the malicious prosecution claim should have been aimed at the Ward County State's Attorney's office, rather than at the named defendants. (Doc. #78, p. 97). The court previously denied Epps' request to amend his complaint to assert a claim against Ward County or its state's attorney's office. (Doc. #48). Given Epps' deposition testimony and the procedural history regarding this claim, it is clear that the first necessary element for the malicious prosecution claim is lacking–none of the named defendants instituted or continued the prosecution.

The second element—termination of the proceeding in favor of the accused—is satisfied. Although the Air Force conducted disciplinary proceedings, the state criminal charge was dismissed. (Doc. #78, p. 70). Therefore, the state's prosecution was terminated in Epps' favor, though there is no evidence in the record that it was terminated because of lack of probable cause.

With regard to the third element, absence of probable cause for the proceeding,

this court has already determined, as discussed above, that the police officers had at least arguable probable cause to arrest Epps for terrorizing. Laudenschlager and Nagel then completed affidavits, recording their recollections of the incident. Both officers stated Epps issued a threat concerning a gun, and the criminal charge of terrorizing was filed on the basis of the officers' affdavits. The court recognizes Epps' denial that he issued a threat, but no evidence shows any willful falsification of the officers' affidavits. Therefore, based on those affidavits, probable cause existed to initiate the criminal proceeding against Epps. Further, the fourth element of a malicious prosecution claim requires malice or a primary purpose other than that of bringing an offender to justice. The fourth element cannot be established, since there was sufficient probable cause for the proceeding. Epps has not met his burden of setting forth facts, other than his own conclusory statements, showing any genuine issue for trial. The Minot defendants are therefore entitled to qualified immunity on the malicious prosecution claim, their summary judgment motion should be granted, and that claim should be dismissed with prejudice.

### (3). Negligence

Epps also asserts a negligence claim for a Fourth Amendment violation of his right to due process. He alleges the officers breached their "duty to fully investigate the circumstances surrounding" his arrest. The individual defendants argue that Epps has not asserted a cognizable § 1983 claim. The court agrees. Under Eighth Circuit precedent, a § 1983 claim for negligent investigation is not recognized. See, e.g., Amrine v. Brooke, 522 F.3d 823, 833-34 (8th Cir. 2008) (holding "[m]ere negligent failure to investigate does not violate substantive due process" and "allegations of gross

negligence do not give rise to a constitutional violation"). Thus, as to any § 1983 negligence claims, the Minot defendants are entitled to qualified immunity, their motion for summary judgment should be granted, and those claims should be dismissed with prejudice.

To the extent Epps asserts any negligence claims under state law, he has not cited any North Dakota authority recognizing a claim for negligent investigation. Nor has the court's research revealed that any similar claim is recognized in North Dakota. Accordingly, any state law negligence claims should be dismissed with prejudice.

Finally, Epps also claims that his "presentation of a <u>prima facie</u> case is sufficient to submit the case to the jury on a theory of <u>Res Ipsa Loquit[u]r</u>." (Doc. #65, p. 11). Arguments regarding that doctrine are not properly before the court because the doctrine was not raised in the complaint. <u>See</u> Fed. R. Civ. P. 8. Moreover, res ipsa loquitur—a doctrine most often relied upon in accident cases and which allows negligence to be inferred when no evidence demonstrates the cause of the accident—is not applicable to the facts of this case. <u>See, e.g.</u>, <u>Haugen v. BioLife Plasma Servs.</u>, 714 N.W.2d 841, 844 (N.D. 2006) (holding that plaintiffs cannot rely on an inference of negligence when they are able to present specific evidence of negligence and the cause of the accident). Therefore, with regard to any claims of negligence, the Minot defendants' motion for summary judgment should be granted, and those claims should be dismissed with prejudice.

**B.  State Law Claims**

**(1).  Intentional Infliction of Emotional Distress**

Epps alleges he "suffered severe emotional distress during his 1-day period of

wrongful incarceration as a result of the extreme and outrageous conduct of Officers." (Doc. #1, p. 10). He further alleges that the officers "falsified" reports and affidavits and "were not interested in obtaining exculpatory evidence that would have establish[ed] the truth as to what happened during" the incident. Id. at 11. The Minot defendants state that, during his deposition, "Epps clarified the IIED [intentional infliction of emotional distress] claim was directed only at Officers Laudenschlager and Nagel, and not at Officers Kline, Folven, or the City of Minot." (Doc. #69, p. 25; see also Doc. #78, p. 101). In opposition to summary judgment, Epps does not argue that this claim applies to all of the Minot defendants, and his deposition testimony clearly states that he is asserting IIED claims only against Laudenschlager and Nagel. (See Doc. #78, p. 101). This court therefore analyzes the IIED claim only as to Laudenschlager and Nagel.

A claim of intentional infliction of emotional distress under North Dakota law requires proof of "(1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress." Muchow v. Lindblad, 435 N.W.2d 918, 922-24 (N.D. 1989). "[E]xtreme and outrageous conduct . . . is narrowly limited to outrageous conduct which exceeds 'all possible bounds of decency.'" Id. at 924. Liability for intentional infliction of emotional distress requires conduct "regarded as atrocious, and utterly intolerable in a civilized community." Id.

Epps seems to focus his IIED claim on his assertion that Laudenschlager "stated he heard the [P]laintiff issue [a] threat [regarding a gun] in his [the officer's] presence," which Epps denies. (See Doc. #1, p. 6). During his deposition, Epps added that his IIED claim was also against Nagel because "Nagel was corroborating the statement that [Laudenschlager] made." (Doc. #78, p. 101). However, the court has carefully reviewed

the record and concludes that the evidence shows neither Laudenschlager nor Nagel engaged in extreme and outrageous conduct—their conduct cannot be said to exceed all possible bounds of decency, nor can it be regarded as atrocious and utterly intolerable in a civilized community. As discussed concerning the false arrest claim, the court concludes that the officers had at least arguable probable cause to arrest Epps, and their conduct thus cannot rise to the requisite level for a claim of IIED. Therefore, as to any IIED claims, the Minot defendants' motion for summary judgment should be granted, and those claims should be dismissed with prejudice.

### (2). False Imprisonment

Epps asserts a claim for false imprisonment against the Minot defendants. (Doc. #1, p. 11). The Minot defendants argue that because there was sufficient probable cause for Epps' arrest, there can be no false imprisonment. (Doc. #69, p. 28). Epp responds that probable cause was lacking. (Doc. #65, p. 35).

This court has already concluded that the evidence establishes the existence of at least arguable probable cause to arrest Epps. Accordingly, there can be no false imprisonment. The Minot defendants' motion for summary judgment should thus be granted, and any false imprisonment claims against them should be dismissed with prejudice.

## 2. Claim Against Non-Governmental Defendants

Epps asserts four claims of negligence and one claim of negligent infliction of emotional distress against the Mueller defendants.[3]

---

[3] It is unclear whether Epps alleges § 1983 liability against the Mueller defendants. (See, e.g., Doc. #66, p. 5). The court notes that neither Mueller individually

## A.    Negligence Claims

While negligence actions are typically not appropriate for summary judgment, the issue of "whether a duty exists is generally a preliminary question of law for the court to decide." Collette v. Clausen, 667 N.W.2d 617, 621 (N.D. 2003). Thus, the court must consider whether, as a matter of law, the Mueller defendants owed any duty to Epps.

With regard to the first negligence claim, Epps does not expressly allege what duty the Mueller defendants owed him, but Epps states that the Mueller defendants breached "that duty" following the altercation with Dalby as follows: by not calling police "in a timely manner;" by not removing Dalby from the premises; by not having "a properly working security system;" by not protecting Epps; by not providing Epps with a copy of "surveillance tape" of the incident; by "[t]elling the arresting officer that . . . there were three black males [that] had a gun in the bar, when in fact the gun was never brought into the bar;" by not informing "police of a mistake [regarding the presence of the gun in the bar] which would have prevented Plaintiff Epps from being arrested." (Doc. #1, pp. 11-12). Epps contends that he was "wrongfully arrested" as a result of the Mueller defendants' breaches. Id. at 12. Because Epps is proceeding pro se, this court liberally construes his first claim as alleging that the Mueller defendants owed a duty to protect Epps from harm by other bar patrons. See Erickson, 551 U.S. at 93.

_____

nor Sports on Tap are state actors, and there are no allegations that they were acting under color of state law during the incident in question; therefore, there is no basis for § 1983 liability against them. See Dist. of Columbia v. Carter, 409 U.S. 418, 424 (1973) (noting § 1983 addresses only deprivations of rights that are accomplished under color of state law and "does not reach purely private conduct.").

The Mueller defendants acknowledge that "a bar owner . . . owes a duty to its patrons to protect them from assault by other patrons when the owner has reasonable cause to anticipate the conduct on the part of third persons which is likely to endanger the safety of patrons." (Doc. #59, p. 10) (citing <u>Zueger v. Carlson</u>, 542 N.W.2d 92, 96-97 (N.D. 1996)). The Mueller defendants also note that, even if a specific "attack" was not foreseeable, a bar owner has a duty once an attack begins to exercise reasonable care to stop the attack. <u>Id.</u> (citing <u>Zueger</u>, 542 N.W.2d at 97). However, the Mueller defendants argue that they "had no notice that Dalby would get into an altercation with the Plaintiff." <u>Id.</u> The Mueller defendants note one previous "minor" incident that may have involved Dalby, but that incident may have instead involved Dalby's twin brother; moreover, the prior incident "did not involve any physical altercation and occurred outside of the bar after the bar had closed." <u>Id.</u> at 11. The Mueller defendants state that no other evidence demonstrates Dalby's involvement in previous altercations at the bar.

The court has carefully reviewed the record and finds no evidence regarding Dalby's conduct that would have given the Mueller defendants reasonable cause to anticipate his conduct would likely endanger the patrons' safety. So, the Mueller defendants owed no duty on the basis of Dalby's past actions. Further, the evidence, when viewed in the light most favorable to Epps, demonstrates that, once the altercation began, the Mueller defendants exercised reasonable care to stop the altercation. Epps states that, after the altercation with Dalby began, Epps was "tackled from the rear[,] . . . believing it to be bar security." (Doc. #1, p. 4). The Mueller defendants note their "policy to make people who are fighting leave separately in order to prevent the fight from continuing outside." (Doc. #59, p. 12). Indeed, Epps notes that when he left the bar, he

waited outside for approximately ten to fifteen minutes, after which time both of his friends—and eventually Dalby—exited the bar. (Doc. #1, p. 5). The evidence demonstrates that the Mueller defendants did not have reasonable cause to anticipate that Dalby's conduct would endanger the safety of the bar's patrons and that, once the altercation between Dalby and Epps began, the Mueller defendants exercised reasonable care to stop it. This court concludes that the Mueller defendants have demonstrated that no material facts are in dispute, and Epps has not met his burden to set forth facts showing a genuine issue for trial. Therefore, with respect to the first negligence claim, the Mueller defendants' summary judgment motion should be granted, and the claim should be dismissed with prejudice.

As to the second negligence claim against the Mueller defendants, Epps alleges the Mueller defendants "owed a duty to properly supervise guests at the bar[, and] . . . to properly protect guests from harm at the bar." (Doc. #1, p. 12). Epps argues the Mueller defendants breached those duties by "[f]ailing to quickly have security come to Plaintiff['s] assistance" and by "[f]ailing to cal[l] 911 as requested on at least two occasions." Id. The Mueller defendants acknowledge that, "[e]ven though not forseeable, [they] still had a duty to stop the attack once it began." (Doc. #59, p. 12). As discussed above, Epps himself recognizes that he was "tackled" by security soon after the altercation with Dalby began, at which point the altercation inside of the bar ended. (Doc. #1, p. 4; see also Doc. #78, p. 10). Although Epps asserts the Mueller defendants did not call police "as requested," the police were called, (Doc. #59-1, p. 9), and they responded to the scene. Recognizing that the Mueller defendants owed Epps a duty to stop the incident after it started, the court concludes that the Mueller defendants'

actions to do so evidence that they did not breach that duty. Epps has not met his burden to set forth facts showing a genuine issue for trial as to this claim. Thus, the Mueller defendants' summary judgment motion as to the second negligence claim should be granted, and the claim should be dismissed with prejudice.

Regarding the third negligence claim against the Mueller defendants, Epps contends the Mueller defendants "owed a duty to the Plaintiff not to communicate false information to the Minot Police." Id. at 12. The Mueller defendants counter that "there is no basis in law for 'negligent false statements to police.'" (Doc. #59, p. 13). This court has likewise found no authority supporting the existence of such a cause of action. The Mueller defendants claim that any "alleged false statements to police would fall under an action for defamation based on civil slander." Id. Because Epps is proceeding pro se, this court liberally construes his complaint as asserting a defamation claim. See Erickson, 551 U.S. at 93.

The court notes that there can be no liability for allegedly defamatory statements that are privileged. See, e.g., Richmond v. Nodland, 552 N.W.2d 586, 588 (N.D. 1996). "Whether privilege applies is a question of law for the courts." Id. The North Dakota Supreme Court has stated that defamatory statements made voluntarily to law enforcement during investigations of criminal activity are qualifiedly privileged. Id. at 589. Yet, that qualified privilege is abused if the statements at issue are made with actual malice, in the absence of reasonable grounds for believing them to be true, and on a topic not relevant to the common interest or duty. Id. (citing Soentgen v. Quain & Ramstad Clinic, P.C., 467 N.W.2d 73, 79 (N.D. 1991)). It is the plaintiff's burden to prove actual malice, which "'depends on scienter and requires proof that a statement was

made with malice in fact, ill-will, or wrongful motive.'" Id. (quoting Soentgen, 467 N.W.2d at 79).

In his complaint, Epps alleges that the Mueller defendants "communicat[ed] to Minot Police Officer[s] that the three black men had a gun; when in fact, [Tony Mueller] never saw a gun." (Doc. #1, p. 12). However, in Mueller's answers to interrogatories, he states, "I called 911 a second time after I saw a gun pulled to ask the police to arrive immediately as a gun had been drawn." (Doc. #59-1, p. 9) (emphasis added). Epps himself conceded, during his deposition, that Mueller "[during] the 9-1-1 call, he states he sees a gun. Now, he didn't specifically say in the bar . . . . [Mueller] didn't specify [the gun] was outside, so he led them to believe that I took the gun in the bar." (Doc. #78, pp. 70-71) (emphasis added). Other than Epps' conclusory statements in his complaint, he offers no evidence showing that Mueller's statements to police were false or made with malice in fact, ill-will, or wrongful motive. This court concludes that the statements at issue were made under qualified privilege and that Epps has not met his burden to set forth sufficient evidence to proceed with a claim for defamation. As a result, the Mueller defendants' summary judgment motion as to this claim should be granted, and the claim should be dismissed with prejudice.

Finally, Epps asserts that the Mueller defendants owed a duty to patrons "to maintain . . . surveillance monitoring equipment and [to make surveillance video] available as required when requested by police enforcement or subpoena." (Doc. #1, p. 13). Epps seems to imply that, had the Mueller defendants' surveillance footage of the incident in question been provided to police or to Epps, Epps would not have been "wrongfully arrested." See id. However, Epps cited no legal authority demonstrating that

the Mueller defendants owed such a duty to him, (see Doc. #78, pp. 69-70, 72), and this court has identified no authority imposing that duty.[4] This court concludes that the Mueller defendants have demonstrated that no material facts are in dispute and that Epps has not met his burden to set forth facts showing a genuine issue for trial. Therefore, the Mueller defendants' summary judgment motion as to any negligence claims involving surveillance video should be granted, and any such claims should be

---

[4] Epps stated during his deposition that his attorney (who represented him in the criminal matter arising out of the incident) requested, but did not receive, surveillance footage of the incident. (Doc. #78, p. 70). The record contains a copy of a February 26, 2013 letter from Epps' criminal attorney to the Ward County States Attorney, in which the attorney asked that the State obtain recordings of the incident from the Mueller defendants' security cameras. (Doc. #59-3). The record contains no evidence showing that either Epps or his attorney ever contacted the Mueller defendants regarding the surveillance video. Further, in Epps' deposition, the following exchange occurred when Epps was asked if he requested the surveillance video from the Mueller defendants:

> A.      I was instructed by my leadership and by my attorney to stay away from that bar for the duration of the proceedings.
>
> . . . .
>
> Q      . . . . But I want to know, did your attorney or you make any request directly to Tony Mueller, Sports on Tap?
>
> A.      I gave him Tony's name and I had said: you need to contact him, interview him.
>
> What he did after that, I mean, I wasn't there on the phone with him.
>
> Q.      Okay. So you don't know?
>
> A.      Right.

 (Doc. #78, p. 73). His deposition testimony demonstrates that Epps himself never requested surveillance video from the Mueller defendants and that he is unsure whether his criminal attorney ever requested the video from the Mueller defendants.

dismissed with prejudice.[5]

**B.     Negligent Infliction of Emotional Distress**

Epps asserts a claim against the Mueller defendants for negligent infliction of emotional distress, alleging the Mueller defendants undertook an obligation to keep Epps safe from harm and breached that obligation. (Doc. #1, p. 14). In support of his claim, Epps cites the same purported breaches listed in the negligence claims against the Mueller defendants. Id. Epps claims he has resultingly suffered "severe mental anguish, loss of professional and personal reputation, . . . and serious emotional distress." Id. The Mueller defendants move for summary judgment, arguing Epps has not demonstrated any bodily harm, which is necessary for sustaining his claim. (Doc. #59, p. 16).

"A plaintiff claiming negligent infliction of emotional distress must show 'bodily harm.'" Hougum v. Valley Mem'l Homes, 574 N.W.2d 812, 819 (N.D. 1998) (quoting Muchow v. Lindblad, 435 N.W.2d 918, 921 (N.D. 1989)). "Bodily harm" means "any physical impairment of the condition of another's body, or physical pain or illness." A long continued physical illness, such as nausea or headaches, or a long continued mental disturbance, including repeated hysterical attacks or mental aberration, may amount to the requisite bodily harm. Id. However, transitory, non-recurring physical phenomena that is inconsequential but may be present with some emotional disturbance does not amount to bodily harm sufficient to support a claim for negligent infliction of emotional

---

[5] In his response to the Mueller defendants' motion for summary judgment, Epps discusses North Dakota's dram shop statute. (Doc. #66, pp. 15-18). It is unclear whether Epps is attempting to assert a dram shop action in his summary judgment response, but such a claim is not properly before the court because it was not raised in the complaint. See Fed. R. Civ. P. 8.

distress. <u>Id.</u>

This court concludes the record contains insufficient evidence to show that Epps suffered the "bodily harm" necessary to maintain his claim for negligent infliction of emotional distress. During his deposition, Epps testified the only physical injury he suffered in the incident was to his lip, which healed appropriately without requiring any stitches. (Doc. #78, p. 74). When questioned as to "other types of injuries," Epps stated:

> I mean, there's, you know, psychological, always looking at my career that's no longer there. I still have friends in the Air Force who I sit there and, you know, I celebrate their careers, and I should be right there with them.
>
> Do I need to go see a counselor, a shrink? <u>I don't feel so right now</u>, but who's to say.
>
> I don't have insurance, so if I do, I'll wait until I get insurance.

<u>Id.</u> (emphasis added). Epps' testimony demonstrates he does not suffer from the bodily harm required to proceed with a claim for negligent infliction of emotional distress. The Mueller defendants' summary judgment motion regarding negligent infliction of emotional distress should therefore be granted, and the claim should be dismissed with prejudice.

## Conclusion

For the reasons discussed above, it is **RECOMMENDED** that defendants' motions for summary judgment, (Doc. #53; Doc. #58), be **GRANTED** and that Epps' complaint be **DISMISSED** with prejudice.

Dated this 30th day of December, 2015.

 _/s/ Alice R. Senechal_
Alice R. Senechal
United States Magistrate Judge

**NOTICE OF RIGHT TO OBJECT**

Pursuant to Federal Rule of Civil Procedure Rule 72(a) and (b) and District of North Dakota Civil Local Rule 72.1(D)(2) and (3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **January 13, 2016**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.